IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

UNITED STATES OF AMERICA          )          MO-09-CR-075
                                  )
                                  )
VS.                               )          **Sentencing**
                                  )
                                  )
PAUL JOSEPH GALVEZ                )          September 3, 2009

**BEFORE THE HONORABLE ROBERT JUNELL**
**UNITED STATES DISTRICT JUDGE**
**In Midland, Texas**

**FOR THE GOVERNMENT:**          **MR. JEFF PARRAS**
                                 **MS. KERRY A. FLECK**
                                 Assistant United States Attorneys
                                 400 W. Illinois, Suite 1200
                                 Midland, Texas  79701
                                 (432) 686-4110

**FOR THE DEFENDANT:**           **MR. DAVID GREENHAW**
                                 Law Office of David Greenhaw
                                 P.O. Box 311
                                 Odessa, Texas  79760
                                 (432) 580-7617

**COURT REPORTER:**              **MR. TODD ANDERSON, RMR, CRR**
                                 United States Court Reporter
                                 200 E. Wall, Rm. 107
                                 Midland, Texas  79701
                                 (432) 686-0605

     The above-styled and numbered cause was reported by

mechanical stenography and produced by computer.

INDEX

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR THE GOVERNMENT: | | | | | |
| CAROLYN SMITH | 11 | 15 | | | |
| DENA MORALES | 16 | 28 | 30 | 30 | |

Government rests.................................... 31

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR THE DEFENDANT: | | | | | |
| PAUL JOSEPH GALVEZ | 32 | 35 | 38 | | |

ARGUMENT:  Ms. Fleck................................. 42

ARGUMENT:  Mr. Greenhaw.............................. 44

Court's ruling...................................... 47

```
 1                    (September 3, 2009)

 2                    (Defendant present)

 3             THE CLERK:  Court calls MO-09-CR-075, the United

 4    States of America versus Paul Joseph Galvez.

 5             MR. PARRAS:  Jeff Parras and Kerry Fleck for the

 6    United States.

 7             MR. GREENHAW:  David Greenhaw with Mr. Galvez, Your

 8    Honor.  Good morning.

 9             MR. PARRAS:  Your Honor, we have a couple of

10    witnesses that came in from out of town, I think from Waco, and

11    they had just walked in, so Ms. Fleck stepped outside to visit

12    with them just briefly.

13             THE COURT:  Okay.  Do you want to wait for a second

14    till they get in here?

15             MR. PARRAS:  Ms. Young went over to see if they're

16    ready.

17             THE COURT:  Let me see counsel for just a second.

18    This is off the record.

19                    (Discussion off the record)

20                    (Pause)

21             MR. PARRAS:  Your Honor, may we approach, me and

22    Mr. Greenhaw?

23             THE COURT:  Sure.

24                    (Discussion off the record)

25             THE COURT:  Is this your case or Mr. Parras's?  I'm
```

1   sorry.

2           MS. FLECK:  It's mine, Your Honor.

3           THE COURT:  Oh, okay.  Mr. Parras was up here.

4           All right.  Mr. Galvez, would you come up to the

5   podium, please, sir?

6           Would you state your name, please?

7           THE DEFENDANT:  Paul Galvez.

8           THE COURT:  And are you also known as Paul Joseph

9   Galvez?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  And are you the Defendant in this case?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Okay.  Did you receive a copy of the

14  written presentence investigation report?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  All right.  And did you read that report?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  And did you discuss that report with your

19  attorney?

20          THE DEFENDANT:  Yes.

21          THE COURT:  And, Mr. Greenhaw, did you receive a copy

22  of the report and discuss it with your client?

23          MR. GREENHAW:  I did, Your Honor.

24          THE COURT:  And, Mr. Greenhaw, does the Defendant

25  have any objections or corrections to the report?

1          MR. GREENHAW:  No, Your Honor, we did not have any

2     objections filed.

3          THE COURT:  Does that mean that you don't have any

4     objections?

5          MR. GREENHAW:  No, we have no objections, Your Honor.

6          THE COURT:  Okay.  And, Mr. Galvez, do you have any

7     questions about the presentence report or anything like that

8     you would like to ask Mr. Greenhaw or me?

9          THE DEFENDANT:  No, sir.

10          THE COURT:  Okay.  And, Ms. Fleck, does the

11     Government have any objections to the report?

12          MS. FLECK:  No, Your Honor.

13          THE COURT:  I have reviewed the presentence

14     investigation report prepared by U.S. Probation Officer Lorena

15     Toscano.  I find the report accurate and correct, and I adopt

16     the report and the application of the U.S. Sentencing

17     Guidelines.

18          The total offense level is a 31.

19          The criminal history category, a 3.

20          The guideline range for custody is 135 to 168 months.

21          The Defendant is ineligible for probation.

22          The guideline range for supervised release is up to

23     life.

24          The fine range is $15,000.00 to $150,000.00.

25          And the special assessment is $100.00.

1    I don't believe I -- the Government didn't file for

2  an upward departure, did you?

3         MS. FLECK:  I did, Your Honor.

4         THE COURT:  Okay.  I would be glad to hear from you

5  on your motion for an upward departure.

6         MS. FLECK:  Do you have a copy?

7         THE COURT:  I don't think so.

8         Did you get a copy?

9         PROBATION OFFICER:  Yes, Your Honor.

10        THE COURT:  I'm not sure, I did.

11        All right.  Ms. Fleck, I would be glad to hear from

12  you on an upward departure or variance.

13        MS. FLECK:  Your Honor, the main reason that I'm

14  asking for an upward departure in this case is that under

15  Guideline Section 2G2.2, Subsection (6) of the guidelines, if

16  the Government can show a pattern of sexual abuse or sexual

17  exploitation of a minor, then an upward departure may be

18  warranted.

19        In this case, the Government is arguing that

20  Mr. Galvez has engaged himself in a pattern of sexual

21  exploitation of children, not only by the count of conviction

22  which he has pled to and is about to be sentenced to in this

23  case, but also the fact that prior to his imprisonment for

24  unrelated charges back in -- I believe it was 2007 -- his wife

25  at the time was interviewed by Agent Morales with the FBI in

1  this case and indicated that at that time a computer was

2  recovered from the house that he apparently was alleged or, I

3  believe, convicted of having set on fire.

4         She was able to salvage one of many computers or hard

5  drives that he had in the house.  In that computer she saw a

6  tremendous amount of pornography, some of which depicted boys

7  that appeared to be very young to her, including a video that

8  depicted him having sex with a boy that appeared to be

9  approximately 14 years of age.

10         This obviously concerned her, and she wanted to get

11  this contraband off of her computer.  She brought it to a

12  friend of hers who's good with computers, named Carolyn Smith,

13  in hopes that she could get this taken care of without having

14  to pay a computer repairman a lot of money.

15         Carolyn Smith then was able to confirm that there

16  was, in fact, several images and videos that depicted very

17  young boys.  She could tell that they were young because none

18  of the boys had any body hair on them.  The exact age was sort

19  of a guess, but clearly under the age of 18.  Also an image or

20  a still picture that depicted Mr. Galvez with one of these

21  boys.

22         In addition to that, obviously, the computer was

23  seized when Mr. Galvez was indicted on these charges.  It was

24  sent to the FBI CART for analysis, and several pictures and

25  videos involving child pornography were recovered from the

1  computer.

2          Unfortunately, because of the damage caused by the

3  fire and the water that the fire department had to use as well

4  as the actions that were taken to destroy these images or get

5  them off of the computer, CART was not able to find any of the

6  pictures or videos that the previous witnesses I mentioned had

7  observed.

8          They did not find any pictures or videos that

9  depicted Mr. Galvez with any of the children they did find.

10  However, they were able to tell that the computer had been

11  worked on and that several images and videos had been deleted,

12  and some of the files were then corrupt and were not able to be

13  recovered.

14          Based on all of that, the Government is asking that

15  Your Honor upward depart because the Defendant has involved

16  himself in a pattern of sexually exploiting children.

17          It seems in all honesty that the guidelines seem to

18  recommend an upward departure of five levels because it does

19  talk about Section (5)(b) of 2G2.2, which would apply a

20  five-level increase.  And the commentary 6 basically says that

21  if that section does not apply, then an upward departure may be

22  warranted, which seems to indicate that maybe a five-level

23  increase would be warranted in this case.

24          In all honesty, I don't think that that's enough.

25  That is what I've recommended in my motion because that seems

1    to be what the guidelines recommend, but that would put him at

2    a guideline range of 235 to 293 months.  Given not only what

3    he's pled to but the pattern that he has shown in his past in

4    sexually exploiting children, that doesn't even seem like

5    enough time.

6            And I would also point out to Your Honor that in the

7    presentence report there's some talk, not only from the

8    witnesses involved but also from Mr. Galvez himself, about sort

9    of feeling discriminated in his lifetime for being homosexual.

10   And I want to make it extremely clear to Mr. Galvez and to this

11   Court that that has absolutely nothing to do with this

12   prosecution or this motion in general.

13           The fact is that these people that he was exploiting

14   were children.  That is the point.  Boy or girl does not

15   matter.  He was exploiting children sexually; and, therefore, a

16   motion for upward departure is warranted.

17           I do have some of the witnesses, as well as Agent

18   Morales, present, although it doesn't seem that there is any

19   objections to the facts contained in the report, so --

20           THE COURT:  I'm not sure that -- Mr. Greenhaw, when

21   we had our discussion up here, I'm not sure that --

22           Well, Mr. Greenhaw, do you stipulate, I guess, to the

23   facts that are set forth in the Government's motion for an

24   upward departure?

25           MR. GREENHAW:  Your Honor, I think that perhaps

1    Mr. Galvez may not agree with that.

2              THE COURT:  Okay.

3              MR. GREENHAW:  So I think perhaps if they want to

4    prove it up, then it would be necessary.

5              THE COURT:  I want the parents of the young children

6    taken from the courtroom, please, right now.  We're going to

7    have some pretty graphic testimony, and so I would rather

8    that -- since they're not involved --

9              Mr. Galvez, these aren't people involved with you,

10   are they?  I don't think they are.  We have a number of people.

11   So let's take them out.

12             All right.  Y'all have a seat, please, Mr. Greenhaw

13   and Mr. Galvez.

14             Would you call your first witness, Ms. Fleck?

15             MS. FLECK:  The Government calls Carolyn Smith.

16             THE COURT:  Okay.  Ms. Smith, if you would come up

17   here and be sworn as a witness, please.

18             (Pause)

19             THE COURT:  Ms. Smith, come right up here and be

20   sworn as a witness, please.

21             THE CLERK:  If you will, stop right here and raise

22   your right hand, please.

23             (The witness was sworn)

24             THE CLERK:  Have a seat.

25             THE COURT:  Before we go on with Ms. Smith's

1    testimony, on paragraph 2 of your motion for upward departure,

2    you -- I'm not quite sure -- it says, "Alternatively, the

3    Government moves for an upward departure according to

4    Sentencing Guideline commentary Section 2G2.2(6)."

5             I assume that what you're talking about -- well,

6    under 2G2.2, if you have a copy of the guideline handy, it's

7    (b)(5) is the provision that provides for "If the Defendant

8    engaged in a pattern of activity involving the sexual abuse or

9    exploitation of a minor, increase by five levels."

10            MS. FLECK:  Correct.  And it probably didn't cite it

11   clearly, but if you turn --

12            THE COURT:  And then it's commentary 6.  I think how

13   that is, just under definitions it's just Number 6.

14            MS. FLECK:  Okay.

15            THE COURT:  2G2.2.

16            MS. FLECK:  That's right.

17            THE COURT:  I just want to clarify that it is under

18   2G2.2(5) [sic] that has that upward departure provision.

19            Okay.  You may proceed.

20            CAROLYN SMITH, GOVERNMENT'S WITNESS, SWORN

21                      DIRECT EXAMINATION

22   BY MS. FLECK:

23   Q.   Okay.  Good morning, ma'am.  Could you please introduce

24   yourself to the Court?

25   A.   My name is Carolyn Smith.

1   Q.   And if you could tell us where you're from.

2   A.   I live in Waco, Texas, now.

3   Q.   Okay.  Did you previously live in Andrews, Texas?

4   A.   Yes, ma'am.

5   Q.   And were you friends with a woman by the name of Mary

6   Galvez, or that was her name at the time?

7   A.   Yes, ma'am.

8   Q.   And did you know her husband, Paul Galvez?

9   A.   Yeah, a little bit.  I met him a few times.

10  Q.   Do you recall -- I'm going to take you back a few years

11  now.  I know it's been a while.  But do you recall back in -- I

12  believe it was 2007 -- when Mr. Galvez was sent to jail or

13  prison, and Mary came to you asking you for some help with her

14  computer?  Do you recall that?

15  A.   Yes, ma'am.

16  Q.   Can you tell us what she wanted some help with?

17  A.   She -- she wanted me to see if I could clean up the

18  computer a little bit because her -- she wanted to use it.  She

19  said she didn't know what all was on there.

20  Q.   And you were pretty handy with computers?

21  A.   Yeah, deleting stuff.  But it never goes away.  It's

22  usually in the hard drive.

23  Q.   Okay.  But she wanted you to try to delete some stuff that

24  was on the computer; is that right?

25  A.   Yeah, and go through it and see what all was in there.

1    Q.    Did she indicate to you what concerns she had about what

2    was on the computer?

3    A.    She didn't know.

4    Q.    Okay.  When you started going through the process of

5    cleaning up the computer, what did you see?

6    A.    Well, I opened it up -- we turned it on and just started

7    going through like files and pictures and stuff, and there was

8    a bunch of dirty pictures on there.

9    Q.    Now, when you say "dirty pictures," is it fair to say

10   these pictures were pornographic?

11   A.    Yes, they were.

12   Q.    Were some of the pictures involving adults?

13   A.    Yeah, a few, but they were mainly young kids.

14   Q.    So the majority of the pictures that you saw were young

15   children?

16   A.    Yes, ma'am.

17   Q.    Boys or girls?  Do you recall?

18   A.    They were mainly boys.

19   Q.    And I know it's, again, been awhile, but do you have an

20   approximate age of how old these boys looked to you?

21   A.    I would say probably between 9 and 14.  They didn't have

22   no hair.  Some of them didn't have no hair.

23   Q.    And when you say "no hair," do you mean no hair on their

24   body?

25   A.    At all.

1  Q.   Okay.  Did you attempt to erase or delete these files?

2  A.   No.

3  Q.   Okay.  What did you do with the computer after you saw

4  them?

5  A.   I told them that they needed to go somewhere and get this

6  fixed.

7  Q.   When you say "they," you told Mary?

8  A.   Yeah.  I told her if she takes it to a computer shop and

9  it's her computer with that pornographic [sic] on it, you know,

10 they could charge her with it, because they're going to have to

11 turn it in.

12 Q.   Okay.

13 A.   So we then called the police.  I believe Mary called the

14 police.  And then they got ahold of the FBI agent, and they

15 came out and picked the computer up.

16 Q.   Now, you mentioned the images that you saw.  Do you recall

17 today if they were still images like pictures or if they were

18 video clips?

19 A.   There were both.

20 Q.   And do you recall, in at least one of these pictures or

21 video clips, seeing Mr. Galvez?

22 A.   Yes, but I can't remember if it was a picture or a video

23 clip.

24 Q.   Okay.  And do you recall if it was one or more than one?

25 A.   I know there was -- I believe there was a couple of them.

1    Q.    Okay.

2    A.    I know there was one, because I was just -- I was

3    flabbergasted.

4    Q.    Okay.  And you relayed all this information to an FBI

5    agent when she came and spoke to you?

6    A.    Yes, I did.

7    Q.    And was that closer in time to when you had seen all of

8    these things?

9    A.    Yes.

10   Q.    Okay.

11          MS. FLECK:  I have no further questions, Your Honor.

12          THE COURT:  Mr. Greenhaw.

13                     CROSS-EXAMINATION

14   BY MR. GREENHAW:

15   Q.    So your recollection is such that you're not able to tell

16   the Court whether or not there were any video pictures of this

17   Defendant?

18   A.    I can't remember if it was video or a picture.

19   Q.    Okay.  So it's very likely that it was a still picture, or

20   perhaps your recollection would be better?

21   A.    It's likely it was.  I can't remember which one it was.

22   Q.    Okay.

23          MR. GREENHAW:  Nothing else.

24          THE COURT:  Just so that I'm clear, whether it was a

25   still or a video, did you have Mr. Galvez in the picture?  What

1    was happening?

2                THE WITNESS:  He was with a young boy.

3                THE COURT:  Okay.  And the young boy --

4                THE WITNESS:  I can't remember if -- I can't remember

5    what they were doing.  Some kind of sexual -- I can't remember

6    exactly.

7                THE COURT:  Were they naked --

8                THE WITNESS:  Yes, yes.

9                THE COURT:  -- or had clothes?

10               Both of them?

11               THE WITNESS:  Yes.

12               THE COURT:  Okay.  All right.  That's all I have.

13               Thank you very much for being here today.

14               THE WITNESS:  Thank you.

15               MS. FLECK:  Your Honor, I call Agent Morales.

16               (Pause)

17               (The witness was sworn)

18               THE CLERK:  Have a seat.

19               DENA MORALES, GOVERNMENT'S WITNESS, SWORN

20                         DIRECT EXAMINATION

21   BY MS. FLECK:

22   Q.   Good morning, Agent Morales.  Could you state your name

23   for the record?

24   A.   Dena Morales.

25   Q.   And you're with the FBI; is that correct?

1   A.   Correct.

2   Q.   And you primarily investigate child exploitation cases?

3   A.   I do.

4   Q.   I want to turn your attention back to late March 2007 when

5   you began your investigation into Defendant Paul Galvez.  Do

6   you recall that?

7   A.   I do.

8   Q.   You were -- were you contacted by a police department

9   initially?

10  A.   The Andrews Police Department contacted our office.  The

11  duty agent took the call.

12  Q.   And what information were you initially told about this

13  case?

14  A.   Through the criminal -- I'm sorry.  Through the complaint

15  it stated that Mary Galvez had called the Andrews Police

16  Department to report child pornography on a computer.

17  Q.   And what did you do once you received that information?

18  A.   On April 10th of 2007, I took the drive to Andrews, and I

19  visited with Carolyn Smith.  I visited with Mary Galvez.  I

20  visited with the Andrews Police Department.  And I did a fourth

21  interview of the Radio Shack computer examiner or computer --

22  that worked in computers.  I believe Mr. Lutz was his name.

23  Q.   Okay.  Let's start with your interview of Mary Galvez.

24  Was Mary Galvez the Defendant's wife at this time?

25  A.   Correct.

1  Q.   And where was the Defendant when you went to interview

2  Mary?

3  A.   The Defendant was in state custody in the Middleton Unit

4  in Abilene, Texas.

5  Q.   And do you recall why he was incarcerated?

6  A.   I believe several -- what I can recall is fraud and -- it

7  was insurance fraud and arson.

8  Q.   And do you recall that arson -- did this involve the house

9  that he shared with Mary Galvez?

10 A.   Correct.

11 Q.   Okay.  Now, when you met with Mary, what did she tell you

12 about this computer?

13 A.   She said she had taken the computer to her friend's house.

14 She wanted it cleaned up.  She wanted to use it, and it was

15 freezing a lot.  It had a lot of a -- she knew it had

16 pornography, and that's why she thought it was maybe freezing

17 up.

18       And she wanted to go ahead and use it, so she took it

19 to her friend who knew a little bit about computers to go ahead

20 and do some kind of wiping to get it working a little better

21 for her.

22       THE COURT:  Let me ask a question here.  There hasn't

23 been an objection, but why isn't this testimony -- I'm not

24 concerned that it's hearsay, because hearsay can be used in

25 sentencing.  But is it a violation of the Defendant's Sixth

1  Amendment rights, and particularly as articulated under

2  *Crawford*?

3              MS. FLECK:  And, Your Honor, I do have Ms. Galvez

4  here.  I will clarify that further in my direct examination.

5  It's been a few years now, and she doesn't recall.

6              THE COURT:  Well, that's still -- I mean, I'm not

7  sure that -- I don't know the answer to my question that I pose

8  except that it is a concern of the Court about whether or not

9  this witness can testify as to what -- particularly when she's

10 testifying as to the truth of the matters asserted.

11             And it would be testimony -- there's no question this

12 is testimonial testimony that the Defendant is giving

13 concerning this conversation with Ms. Galvez.

14             I don't know the answer to my question, so --

15             MS. FLECK:  It's my understanding that *Crawford*

16 doesn't apply in sentencing hearings, but we did have

17 Ms. Galvez come this morning so that she could be called by the

18 defense, if he wished to question her.

19             THE COURT:  Is your understanding based on a court

20 decision that you might share with the Court?

21             MS. FLECK:  And I don't -- haven't done the research

22 for this.

23             THE COURT:  It's not -- it's not in the Rules.  I

24 mean, it has to do with hearsay.  I understand there's a

25 hearsay exception as to sentencing.  Hearsay is not the issue.

1  The issue is whether or not it violates the Confrontation

2  Clause of the Sixth Amendment to the Constitution.

3        The recent case of Massachusetts versus somebody or

4  another that the Supreme Court enunciated this spring came back

5  on lab reports that were done by affidavit.  The affidavits

6  would certainly satisfy the hearsay requirement under 803, but

7  the issue was whether or not it violated the Defendant's

8  confrontation rights.

9        And I recognize that in that case -- it's like

10 Massachusetts versus -- I can't remember the second name.

11 But -- and I recognize that was in a trial setting rather than

12 in a sentencing setting.  So I think -- I have that concern.

13       So I'm not going to -- in an abundance of safety,

14 since you have Ms. Galvez, I'm not going to consider the

15 testimony of Agent Morales concerning testimony that she heard

16 or statements that Ms. Galvez told her.

17             MS. FLECK:  Okay.

18             THE COURT:  You can elicit from her, but I'm not

19 going to consider it in arriving at a decision.  And I would

20 suggest that unless you want to see this case on habeas -- I

21 assume the Defendant has waived his rights to appeal; is that

22 correct?

23             MS. FLECK:  He has.

24             THE COURT:  Well, the only thing that he hasn't

25 waived is ineffective assistance of counsel.  If Mr. Greenhaw

 1  doesn't object, that might be considered ineffective assistance

 2  of counsel.  So I just want to see a case one time.

 3          MR. GREENHAW:  Your Honor, we also think that they're

 4  going outside the plea agreement.

 5          It's our understanding that if they do go outside the

 6  plea agreement, then that would abrogate our right to appeal.

 7  There's case law that says that if the Government violates its

 8  plea agreement, then we might have a right to appeal.

 9          I have filed an objection to their upward -- to their

10  motion for an upward departure based upon the fact of the plea

11  agreement.

12          THE COURT:  All right.  Point to me what part of the

13  plea agreement you're referring to.

14          MR. GREENHAW:  Well, the fact that they have agreed

15  to dismiss two counts of the indictment, Your Honor, the fact

16  that they have agreed to give a three-point downward departure

17  for acceptance.

18          We think that the fact that it is silent about that,

19  that they cannot come forth now and say that, "Oh, we now think

20  that we want an upward departure."  We think that is precluded

21  by the plea agreement just by its silence, Your Honor.

22          THE COURT:  Okay.  I'm not sure I agree with that.

23  And I think the three points -- actually, they get -- I get to

24  give two, and they get to give one.  If I give my two, then I

25  think the agreement is they'll give their one.  But they found

1    that Mr. Galvez has accepted responsibility.  I'm not sure

2    that's not necessarily tied to the Government being able to

3    move for an upward departure or an upward variance.

4            Is there any specific language, Mr. Greenhaw, in the

5    plea agreement that you can refer to?

6            MR. GREENHAW:  No, Your Honor, just the entire plea

7    agreement.  By its silence in that regard, we would suggest --

8    or we went into it thinking there would not be any such thing,

9    and we relied on the plea agreement in our plea, and so we

10   think they're barred.

11           THE COURT:  Well, I'm sure that -- I don't know who

12   took the plea in this case.  I know I didn't take the plea, I'm

13   sure.  Because we've had a series of magistrate judges,

14   either -- Judge Bommer, probably, would have been the one that

15   took the plea in this case.

16           I assume that he informed the Defendant at the time

17   of the plea that at sentencing the district judge could depart

18   upward or downward, and he would be bound by his plea of guilty

19   and couldn't withdraw it.  I assume that that happened.  I'm

20   not asking y'all to recollect, because I'm sure both of you

21   have done a lot of pleas since this one, but --

22           MR. GREENHAW:  Very likely.  I'm sure that he gave

23   all of the cautionary matters, but we still think that the

24   Government is not going by their side of the plea agreement.

25           MS. FLECK:  And if I could respond briefly.

 1              THE COURT:  Yes, ma'am.

 2              MS. FLECK:  I would point to paragraph 1(f) of the

 3    plea agreement, that although he's only pleading to Count

 4    One -- and we do agree to dismiss the remaining counts, and we

 5    will abide by that.  The punishment range for Count One is ten

 6    to life.  And we're not asking for anything beyond life, so we

 7    are sticking to the terms in the plea agreement.

 8              THE COURT:  Okay.  You may proceed.  Just proceed at

 9    your own caution, because I don't know where we stand on this

10    issue on *Crawford*.

11              MS. FLECK:  Yes, sir.

12              THE COURT:  And if there is a case, I would be

13    glad -- I would like to see it, because it would be helpful to

14    me.

15              Go ahead.

16                      DIRECT EXAMINATION RESUMED

17    BY MS. FLECK:

18    Q.   Okay.  Agent Morales, when you met with Mary Galvez, did

19    she then indicate to you some things she had observed on the

20    computer and also inform you of an individual named Carolyn

21    Smith that you should also speak to?

22    A.   Yes.

23    Q.   And tell us about your conversation with Carolyn Smith.

24    Was it on the same day?

25    A.   Yes, correct.

1    Q.   What did Caroline Smith tell you that she had observed on

2    the computer?

3    A.   Upon looking at the computer to work on it -- she had had

4    it for a couple of weeks.

5         MR. GREENHAW:  Your Honor, I will object on hearsay.

6    And we just had this *Crawford* --

7         THE COURT:  I overrule on hearsay.  I sustain on --

8    that it violates the Defendant's Sixth Amendment rights to the

9    Confrontation Clause.

10   BY MS. FLECK:

11   Q.   Okay.  Based on the interviews you conducted with

12   Ms. Galvez; Mr. Lutz, I believe it was; and Ms. Smith, did you

13   seize the computer and turn it over to the FBI forensic CART

14   lab?

15   A.   I seized the computer ten days after that, went back and

16   worked on the search warrant, came back and picked up the

17   digital media.

18   Q.   And what did the FBI discover was on the computer?

19   A.   The Computer Analysis and Response Team reported about

20   220-something child pornography images; one child pornography

21   video; and images of an unidentified boy, non-sexual in nature.

22   Q.   Have you personally had the opportunity to have to go back

23   and review these videos and images?

24   A.   I did.

25   Q.   And did any of them contain pictures or video with

 1  Mr. Galvez in them as some of the witnesses had told you?

 2  A.    No.

 3  Q.    Did CART describe to you anything in particular with

 4  regards to any damage that was done to this computer or the

 5  files within the computer?

 6  A.    They notified me that the diskettes that were seized were

 7  so corrupt.  No media could be retrieved, or evidence or

 8  digital information could be retrieved.  And, also, the

 9  computer had several information that was not able to be

10  retrieved because it had been deleted.

11  Q.    So were they deleted to the extent that CART couldn't even

12  recover them?

13  A.    Correct.

14  Q.    Okay.  Now, you mentioned diskettes.  How many diskettes

15  were also seized and reviewed by CART?

16  A.    Three.

17  Q.    When you interviewed Mr. Galvez at TDCJ, did he indicate

18  to you that he did, in fact, keep child pornography and back it

19  up onto his diskettes?

20  A.    He said that he had an older computer at home, and since

21  it wasn't working as well, he transferred some of his stuff on

22  the computer into, I believe, 15 diskettes and -- which he used

23  to then upload into his other computer.

24  Q.    And did he admit to the child pornography or just to stuff

25  that he had on his computer?

1    A.    Just stuff that he had on his computer.

2    Q.    Okay.  Now, you did also talk with him about the case that

3    he is being sentenced to today, about the child in Jal,

4    New Mexico; is that right?

5    A.    Correct.

6    Q.    And he admitted that relationship to you?

7    A.    Yes.

8    Q.    What did he tell you?

9    A.    Well, he said that he had met a young man from Jal,

10   New Mexico, on a chat on the computer.  And after establishing

11   some kind of online relationship, he did visit him.  He had

12   some business to do in New Mexico, so he visited him in

13   New Mexico and went to his house, and what he referred to as he

14   gave him a little bit of head.

15   Q.    And what did you take that to mean?

16   A.    Oral sex.

17          THE COURT:  Can I ask you a question?  I mean, he's

18   admitted to that in the plea agreement, I believe, and the

19   plea -- and the presentence report.

20          MS. FLECK:  And I will explain, Your Honor.  The

21   reason I was getting into the interview with the Defendant is

22   that he never tells Agent Morales about any videotapes or

23   pictures that were done with this particular boy, whereas

24   Carolyn Smith has testified that she saw either video or still

25   image -- she can't recall -- with Mr. Galvez and a young boy.

 1   And my point is to show the Court that this is two separate

 2   children, therefore, establishing a pattern of sexual

 3   exploitation rather than one victim.

 4            THE COURT:  Okay.  So you're saying -- Okay.  So

 5   you're saying the young man that's the victim in this case was

 6   not videotaped?

 7            MS. FLECK:  Correct.

 8            THE COURT:  Okay.

 9   BY MS. FLECK:

10   Q.   Now, Agent Morales, after he -- Mr. Galvez admitted to

11   giving this boy oral sex, did he ever at any time indicate to

12   you that this act was videotaped or that pictures were taken or

13   anything of that sort?

14   A.   No.

15   Q.   And the victim, his initials were R.J.?

16   A.   Correct.

17   Q.   Did he ever indicate to you that any pictures were taken

18   of him?

19   A.   No.

20   Q.   How old was R.J. at the time of the offense, if you

21   recall?

22   A.   He was 15.

23            MS. FLECK:  I have no further questions, Your Honor.

24            THE COURT:  Okay.  Mr. Greenhaw.

25

1                        CROSS-EXAMINATION

2    BY MR. GREENHAW:

3    Q.   Everything -- did you interview the young boy in

4    New Mexico?

5    A.   Yes, sir, I did.

6    Q.   And he did not want to get involved, and it was all

7    consensual?  He was never pressured or anything such as that,

8    was he?

9    A.   He said he felt a little bit threatened at one point, at

10   which time he told him to leave.

11   Q.   Okay.  And he left?

12   A.   Correct.

13   Q.   So there wasn't -- basically, the young boy had also

14   initiated this through the Yahoo service; is that correct?

15   A.   R.J. informed me that Mr. Galvez first contacted R.J., and

16   R.J. did decide to meet him.

17   Q.   Well, R.J. had to have uploaded his material to Yahoo as

18   well, did he not?

19   A.   Yes.  But the way it works on chat, you -- not ask

20   permission, but you talk to somebody, and that person can talk

21   back to you.  So you initiate a conversation.

22   Q.   Well, the young boy initiated Yahoo?

23   A.   Correct.

24   Q.   Okay.

25   A.   Correct.

1    Q.   And then everything else was consensual?

2    A.   Correct.

3    Q.   Okay.  And as far as this other picture goes, we're

4    just having to rely on the recollection of the prior lady,

5    Ms. Smith; is that correct?

6    A.   Yes, sir, and two others.

7    Q.   Because everything that she has observed was destroyed or

8    was deleted?

9    A.   I'm not sure if everything.  I know some were.

10   Q.   Well, you never saw any -- anything with him and anyone

11   else, did you?

12   A.   Correct.

13   Q.   So anything that -- and her recollection wasn't very good.

14   You were in the courtroom, weren't you?

15   A.   Correct.

16   Q.   And she couldn't recall if there was a still photo or a

17   video or anything such as that, correct?

18   A.   Correct.

19   Q.   All right.  So we're not -- we don't have anything except

20   her recollection to show that he was with anyone else on the

21   picture on the computer, correct?

22   A.   Outside from R.J., correct.

23   Q.   Okay.  And R.J., he said he never had any pictures taken?

24   A.   That is correct.

25   Q.   Okay.

1          MR. GREENHAW:  Pass the witness.

2          THE COURT:  Ms. Fleck.

3                      REDIRECT EXAMINATION

4    BY MS. FLECK:

5    Q.   Agent Morales, when you interviewed Carolyn Smith

6    immediately after she saw these videos, that was a little over

7    two years ago.  Is that about right?

8    A.   Yes, that's correct.

9    Q.   April of 2007?

10   A.   Yes.  April of 2007, correct.

11   Q.   And was her memory clear at that time?

12   A.   Yes.

13          MS. FLECK:  No further questions.

14                      RECROSS-EXAMINATION

15   BY MR. GREENHAW:

16   Q.   And at that point in time, did you immediately go to get

17   the search warrant?

18   A.   About three days later I went to obtain a search warrant.

19   Q.   And as a result of the search warrant, you weren't able to

20   ever get the pictures that she has recollections of?

21   A.   You're right.

22          MR. GREENHAW:  No further questions.

23          THE COURT:  Anything else?

24          MS. FLECK:  No, Your Honor.

25          THE COURT:  All right.  Thank you very much, Agent.

1          THE WITNESS:  Thank you, Your Honor.

2          MS. FLECK:  And I have no other evidence, Your Honor.

3    The Government rests.

4          (Government rests)

5          THE COURT:  Mr. Greenhaw, do you desire to offer any

6    evidence?

7          MR. GREENHAW:  Your Honor, the Defendant would like

8    to speak.

9          THE COURT:  He'll have to testify on this issue.  He

10   has to be placed under oath and testify.

11         MR. GREENHAW:  Yes.  He does elect to do so, Your

12   Honor.

13         THE COURT:  Mr. Galvez, I'm going to give you your

14   Fifth Amendment warnings.

15         You understand you have the right to remain silent.

16   You are not required to testify in this matter till you are

17   sentenced.  You can claim the Fifth Amendment right not to

18   testify if you decide not to testify.

19         If you do testify, the Government's attorney is going

20   to be able to cross-examine you.  Do you understand that?

21         THE DEFENDANT:  (Indicating in the affirmative)

22         THE COURT:  Is that "yes"?

23         THE DEFENDANT:  Yes, sir.  I'm sorry.

24         THE COURT:  And if you don't testify, I will not

25   attach any significance to the fact that you did not testify.

1   Do you understand that?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  Okay.  Is it your desire to testify?

4            THE DEFENDANT:  Yes, sir.

5            THE COURT:  Okay.  Come up here and take the witness

6   stand.

7            And, Mrs. LaForge, would you swear Mr. Galvez.

8            (Pause)

9            THE CLERK:  If you will, stop and raise your right

10  hand, please.

11           (The Defendant was sworn)

12           THE CLERK:  Have a seat.

13            PAUL JOSEPH GALVEZ, DEFENDANT, SWORN

14                    DIRECT EXAMINATION

15  BY MR. GREENHAW:

16  Q.   Please state your name.

17  A.   Paul Joseph Galvez.

18  Q.   And you are the same man that pled guilty to Count Two of

19  the indictment in this case, correct?

20  A.   Yes.  Yes, sir.

21  Q.   And you read the presentence report, and we filed no

22  objections, correct?

23  A.   Yes, sir.

24  Q.   And you knew and understood that you were looking at a

25  substantial period of time in prison when you pled guilty to

1  this offense, correct?

2  A.   Yes, sir.

3  Q.   And you -- whenever you were interviewed, you admitted

4  what you had done, correct?

5  A.   Correct.

6  Q.   And is it now that they're accusing you of things in

7  addition to what you have done?

8  A.   Correct.  Some of the things they're saying are not

9  correct.

10 Q.   Okay.  And it relates to their enhancement, what they have

11 requested for an upward departure, correct?

12 A.   Yes, sir.

13 Q.   And that is where you take offense with the factual basis?

14 A.   Yes, sir.

15 Q.   And you're saying -- is it basically your testimony that

16 there were no pictures of you and any other children?

17 A.   I was told whenever they came and saw me in TDC that they

18 had pictures of me, and I told them that I was not aware of

19 these pictures.  As far as I knew, there was no pictures of me

20 except for just me alone.

21 Q.   Okay.  You acknowledge that you did have pictures of child

22 pornography?

23 A.   No, not on the computer that I was aware of.  The only

24 child pornography that I had on there that I was aware of at

25 the time was the young man in his underwear on his bed, and

1  that was it.

2  Q.   And that was the man from --

3  A.   Hobbs, New Mexico.

4  Q.   Well --

5  A.   Or Jal, yes, sir.

6  Q.   Jal, that forms the basis of the indictment?

7  A.   Correct.

8  Q.   And he was clothed?

9  A.   Yes, sir.  He was wearing his underwear.

10 Q.   Okay.  So you told Ms. Morales that you were unaware of

11 any other child pornography?

12 A.   Correct.  But that's whenever she told me that there was

13 pictures of me and him, both.  That's what I was told in TDC.

14 Q.   Well, did you have other child pornography knowingly?

15 A.   No, I did not have any child pornography that I was aware

16 of.  Everything I had on there was adult.

17 Q.   Okay.

18 A.   And --

19 Q.   Had you destroyed any child pornography?

20 A.   No, sir.  I had no -- I had not -- I don't even know how

21 to use a computer enough to destroy it.

22 Q.   Okay.  You acknowledge still your guilt with the young

23 man?

24 A.   Yes.  That is the only thing that I feel that I have

25 really done wrong, is, yes, I did go to Jal, New Mexico, with

1    his permission.  But in the process we did not meet in Yahoo.

2    We met on an adult website.

3    Q.   All right, sir.  And so you take offense, then, with the

4    Government's upward departure that you have engaged in a

5    pattern of this, of child pornography?

6    A.   Yes, sir.  I was always real careful about child

7    pornography.  I did not want to get involved in it, so I did

8    not keep anything like that or even come close of putting

9    anything or looking at something like that.

10              MR. GREENHAW:  All right.  I'll pass the witness.

11              THE COURT:  Ms. Fleck.

12                        CROSS-EXAMINATION

13   BY MS. FLECK:

14   Q.   Sir, you recall pleading guilty in this case on June 18th,

15   just a few months ago, in front of the magistrate judge; is

16   that right?

17   A.   Yes, ma'am.

18   Q.   And you recall being placed under oath by that judge?

19   A.   Yes, I do.

20   Q.   And you recall signing this factual basis and swearing to

21   that judge that this was the truth, and you admitted to the

22   facts contained in the factual basis?

23   A.   Correct.

24   Q.   And in this factual basis, you admitted not only to

25   traveling to New Mexico to have sex with that boy but also to

1    having approximately 225 images and one video depicting child

2    pornography, correct?

3    A.    No, ma'am, I did not.  I was not aware of that part of it.

4    I was only told there was only like three pictures that I was

5    aware of.  That was all.  I didn't know nothing else about all

6    them other ones.

7    Q.    So you admit that you had approximately three pictures --

8    A.    Yes.

9    Q.    -- of child pornography?

10   A.    I was aware I had three that --

11          THE COURT:  Just a second.  Let her finish her

12   question, and then you answer, because my court reporter can't

13   get both of you talking.

14          THE DEFENDANT:  Okay.

15          THE COURT:  Ask your question again, Ms. Fleck.

16   BY MS. FLECK:

17   Q.    So you admit that you had approximately three videos or

18   pictures of child pornography?

19   A.    Yes.

20   Q.    Okay.  Now, not only did you travel to New Mexico to have

21   sex with this boy and you had this child pornography on your

22   computer, but you also had pictures of this boy in New Mexico;

23   is that correct?

24   A.    No, ma'am.

25   Q.    Who was this boy in Hobbs, New Mexico, in his underwear

1    that you took pictures of that you just testified to?

2    A.    Okay.  He sent those to me.  Yes, he sent those to me on

3    my e-mail.

4    Q.    He who?

5    A.    The young man, J.R., whatever his last name is.

6    Q.    The boy in the count that you pled to?

7    A.    Yes, ma'am.

8    Q.    Okay.

9    A.    He is the one that sent those to me.

10   Q.    So you admit to having those pictures as well?

11   A.    Yes.  Those are the only two that I knew.  Well, those two

12   were really the only two I knew of, but I was told by the FBI

13   agent there was more.  They said that there was me with him

14   naked, and that was not true.  And I asked her to show me

15   the -- and I wanted to see them, and they said no; they didn't

16   have them at the time.

17   Q.    And, sir, how many times have you been convicted of crimes

18   in your life?

19   A.    A couple of them.  Arson, insurance fraud, and theft were

20   my three major charges.

21   Q.    And in 1997 a burglary of a building?

22   A.    Yes.  That is correct.

23   Q.    And in -- or when you were about 34, a theft in Plainview,

24   Texas?

25   A.    Yes.

1    Q.    And then besides the convictions, the theft and arson and

2    insurance fraud, you admit to those as well, right?

3    A.    Correct.

4    Q.    You also have been arrested about 11 times on other

5    charges?

6    A.    Yes, but they were all dropped.  Most of them were

7    dropped.

8    Q.    And when you reviewed this presentence report with your

9    attorney, you had no objections to it; is that right?

10   A.    Correct.

11   Q.    Your objection was to my motion, because you don't want to

12   get a higher sentence?

13   A.    Correct.

14            MS. FLECK:  No further questions.

15            THE COURT:  Mr. Greenhaw.

16            MR. GREENHAW:  Very briefly.

17                         REDIRECT EXAMINATION

18   BY MR. GREENHAW:

19   Q.    You were adopted, were you not?

20   A.    Yes, I was.

21   Q.    And your adopted family was very good to you?

22   A.    Yes, they were very excellent to me.

23   Q.    Prior to that time, you had been physically abused, had

24   you not?

25   A.    Correct.

1    Q.   And the presentence report reflects your physical abuse

2    prior to that time, correct?

3    A.   Correct.

4    Q.   And then you were not abused by your adopted family, but

5    some of their acquaintances abused you sexually as a child; is

6    that correct?

7    A.   Correct.  My parents did not do anything.  I've had

8    trouble throughout my childhood life with people doing things

9    to me.

10   Q.   Do you think that that perhaps affected you as an adult?

11   A.   Yes.  Mentally, physically, yes.

12           MR. GREENHAW:  No further questions.

13           THE COURT:  Ms. Fleck, anything else?

14           MS. FLECK:  No, Your Honor.

15           THE COURT:  Okay.  You can step down.  Thank you.

16           THE DEFENDANT:  Thank you, sir.

17           MR. GREENHAW:  That's all we have, Your Honor.

18           THE COURT:  Okay.  Ms. Fleck, anything you want to

19   offer in rebuttal other than argument?

20           MS. FLECK:  I just want to point out to the Court,

21   Your Honor, Ms. Young went and did some quick research for me,

22   and they found a case, *United States versus* --

23           THE COURT:  *Cabbagestalk.*

24           MS. FLECK:  *Beydoun*, B-E-Y-D-O-U-N.  It is from 2006,

25   so I realize that it's prior to the case from Massachusetts

that Your Honor mentioned, but it does indicate in addressing the *Crawford* issue that at sentencing hearsay would still be okay.

THE COURT: Well, here's what -- the Third Court of Appeals in *U.S. versus Cabbagestalk*, which is an interesting name, C-A-B-B-A-G-E-S-T-A-L-K, at 184 Federal Appendix 191, a 2006 Third Circuit case, states the following:

Note that none of our sister Courts of Appeal have addressed the issue of whether *Crawford* applies to sentencing hearings have been willing to expand *Crawford's* reach there. And the Court sites *U.S. versus Chau*, C-H-A-U, at 426 F.3d 1318, 2005 Eleventh Circuit case, refusing to apply *Crawford* at sentencing hearings, and *U.S. versus Luciano*, L-U-C-I-A-N-O, 414 F.3d 174, a 2005 First Circuit case, pointing out that *Crawford* concerned hearsay at trial and that it would not offer its conclusion that there is no Sixth Amendment confrontation right at sentencing, citing *U.S. versus Roche*, R-O-C-H-E, 415 F.3d 614, Seventh Circuit, 2005, cert. denied by the Supreme Court at 546 U.S. 1024. It explained that the relevant provision at sentencing is the Due Process Clause, not the Confrontation Clause, because witnesses at sentencing are not accusers. *United States versus Martinez*, 413 F.3d 239, Second Circuit, 2005, rejecting Defendant's invitation to reconsider the applicability of the Confrontation Clause in light of *Crawford*.

```
 1          So the case I was thinking of, this Massachusetts
 2   case, is Massachusetts versus Melendez-Diaz.  And that case
 3   applied to a trial.  This has to do with the affidavit, a lab
 4   affidavit, which we're all familiar with.  And the Supreme
 5   Court did hold that was violative of the Defendant's Sixth
 6   Amendment right to confrontation.
 7          There is some other case law pre-Melendez-Diaz that
 8   has held that Crawford does not apply to supervised release
 9   revocation proceedings because they are not criminal
10   prosecutions under the Sixth Amendment.  U.S. versus Farmer at
11   567 F.3d 343, a 2009 Eighth Circuit case, and U.S. versus
12   Williams at 443 F.3d 35, a Second Circuit 2006 case, and then
13   U.S. versus Washington, 2009 Westlaw 1919508, a Fourth Circuit
14   2009 case.
15          So what other case law do you have, Ms. Fleck?
16          MS. FLECK:  This is United States versus Beydoun,
17   B-E-Y-D-O-U-N.  It's 469 F.3d 102.  It's a Fifth Circuit case
18   from 2006.  And it cites many of the cases that Your Honor has
19   just cited, so it's along the same lines as what you've just
20   mentioned.
21          I have one copy if Your Honor would like it.
22          THE COURT:  Does it say the Sixth Amendment does not
23   apply?
24          MS. FLECK:  Yes, sir.
25          THE COURT:  Okay.  That's fine.  You don't need to
```

1    give it to me.

2            Okay.  Argument.  And I think the issue that we have

3    factually here is, does one picture on the Defendant's computer

4    that the FBI did not see, that Ms. Smith has a recollection --

5    and it's certainly understandable that her recollection

6    occurred several months ago and she wouldn't have a

7    recollection today that she did then, whether it was a video or

8    whether it was showing -- assuming her testimony to be true and

9    assuming that her testimony is admissible -- of course, she saw

10   it.  She can testify to what she saw.

11           I didn't hear her testimony saying they were having

12   sexual relations, that there was a -- that Mr. Galvez was nude

13   and this young man was nude.

14           Now, let me ask one other question.  Would this time

15   frame -- and I understand that Mr. Galvez just testified that

16   the only picture he ever got of the young man was just of the

17   young man with his underwear on.  So the Government's position

18   is circumstantially it must not be the same person.

19           Does that create a pattern?  If it's a pattern, it's

20   a pattern of what?

21           MS. FLECK:  Well, in response, Your Honor -- and I

22   understand the Court's ruling with regards to the hearsay,

23   because Ms. Galvez --

24           THE COURT:  Assume that I listen to her testimony and

25   I listen to Agent Morales's testimony as well.

1          MS. FLECK:  And I will sort of -- not only that, but

2    rely also on the facts contained in the presentence report.  If

3    you look at paragraph 6, it talks about what Ms. Galvez

4    indicated that she saw on the computer, which was the Defendant

5    having anal sex with a young boy she believed to be 14 years of

6    age.

7          Paragraph 7 describes the interview with Ms. Carolyn

8    Smith, which Ms. Smith testified to.  And in all honesty, it

9    was a little more vague today, but I believe that is

10    understandable given the two-year time gap.  And Agent Morales

11    did testify that she wrote the report.  And, obviously, the

12    presentence report is based off of Agent Morales's report, and

13    that Ms. Smith's memory of what she saw was clear at the time.

14          She observed an image -- several images of child

15    pornography involving young boys, but in particular was one

16    with a boy she believed to be 12 to 16 years of age engaged in

17    anal penetration with Paul Galvez.

18          That along -- and I also elicited the testimony from

19    Agent Morales that she interviewed Mr. Lutz contained in

20    paragraph 8 of the report in which he also reports seeing child

21    pornography on the computer, as well as the CART examination.

22          I believe there is a pattern here because we have

23    images of the Defendant engaging in sexual acts with these

24    boys.

25          We know from interviewing R.J., the victim, and the

1  kind of conviction in this case, as well as the interview of

2  the Defendant, that no pictures or interviews were taken when

3  the Defendant performed oral sex on the boy, which was the one

4  time that these two met, when he drove to New Mexico to do

5  this.

6          Therefore, it's reasonable to conclude that the

7  images or videos on the computer with him engaged in sex acts

8  with other boys were not R.J.  Therefore, there's a pattern of

9  him having this illegal activity with young boys, with R.J.,

10  which is the count of conviction today, with the video that

11  Ms. Galvez saw which is described in paragraph 6, I believe it

12  is, with the image that Ms. Smith saw in paragraph 7, as well

13  as the fact that he's downloading child pornography.

14          Whether or not he's in it, whether or not he's

15  manufacturing it, the fact that he's going on the Internet and

16  downloading and possessing this child pornography is, in and of

17  itself, sexually exploiting children.

18          Based on all of that, I believe that there is a

19  pattern of that; and, therefore, I would ask Your Honor to

20  upward depart on that basis.

21          THE COURT:  Mr. Greenhaw.

22          MR. GREENHAW:  Well, Your Honor, of course, we feel

23  like the upward departure is outside the plea agreement.

24  Secondly, we feel like that the quality of Ms. Smith's

25  recollection and testimony is not sufficient to enhance his

1    punishment from which is already a very severe punishment under
2    the guideline range.
3             He's looking at coming out of prison regardless,
4    without an upward departure, in his mid to late 50's.  That
5    will affect him a great deal.
6             He's going to be on supervised release probably until
7    he is so old that he will not have this predilection.
8             THE COURT:  Wait a minute.  He's, what, 41 years old?
9             MR. GREENHAW:  Yes, sir.
10            THE COURT:  And he's going to -- I think the top of
11   the guidelines is like 16 years.  15, 16 years?
12            MR. GREENHAW:  He would be in his mid '50s.
13            THE COURT:  I have sentenced people in this court
14   that have been in their 70's with this predilection, so I'm not
15   sure that there's any scientific evidence that somebody in
16   their mid 50's doesn't have this same predilection.
17            MR. GREENHAW:  Well, I'm not going to, naturally,
18   argue with the Court.  Nonetheless, he will be on supervised
19   release.  I am sure the Court is going to see that he's on
20   supervised release for a long period of time.
21            And, Your Honor, also we would ask the Court to
22   consider the fact about his -- the abuse that he suffered as a
23   child.  And that, in itself, I think is a grounds for us to ask
24   for a downward departure because of the suffering that he had
25   both sexually and as a young adult, physical abuse.

1        But we, of course, are not asking for the downward

2    departure.  We just don't think that the upward departure would

3    be correct even if the Judge does find those things to be.

4        If you do find Ms. Smith's testimony to be sufficient

5    to upward depart, we would suggest that the Court not depart in

6    that manner because of his physical and sexual abuse that he

7    incurred.

8        THE COURT:  The Court finds that even taking into

9    consideration -- even if the Court took into consideration the

10   testimony of Agent Morales of the interview that she had with

11   Ms. Galvez, the Court will note that Ms. Galvez is present in

12   the courtroom, and the Government could have called her as a

13   witness.

14       Even taking into consideration Agent Morales's

15   testimony of her first interview with Ms. Smith, the Court

16   finds the Government has not proved by a preponderance of the

17   evidence that the Defendant did engage in a pattern of activity

18   involving the sexual abuse or exploitation of a minor, and

19   denies the Government's motion for an upward departure.

20       (Lizzie yelps at door)

21       THE COURT:  Just a second.  My daughter is at the

22   door here.  Just a second.  Keep your seats.

23       (Pause)

24       THE COURT:  All right.  Mr. Galvez, you're looking at

25   135 to 168 months of incarceration, supervised release of up to

1    life, a fine range of $15,000.00 to $150,000.00, and a special

2    assessment of $100.00.

3           I would be glad to hear from you and Mr. Greenhaw on

4    anything you would like for me to know before I pronounce

5    sentence in your case.  Anything you would like to say?

6           THE DEFENDANT:  No, sir.

7           THE COURT:  Okay.

8           MR. GREENHAW:  Your Honor, I just wish that the Court

9    would consider the fact that he was physically and sexually

10    abused as a child himself when the Court considers the

11    sentence.  Thank you.

12           THE COURT:  Thank you.

13           Ms. Fleck.

14           MS. FLECK:  Your Honor, I would obviously, for the

15    reasons I stated this morning, ask for the top of the

16    guidelines and a term of imprisonment of life -- I'm sorry --

17    of supervised release.

18           THE COURT:  I'm not departing from the recommended

19    sentence.

20           Pursuant to the Sentencing Reform Act of 1984, which

21    I have considered in an advisory capacity, and the sentencing

22    factors set forth in 18, United States Code, Section 3553(a),

23    which I have considered in arriving at a reasonable sentence --

24    and I do find the guideline range in this case to be fair and

25    reasonable -- the following sentence is imposed:

1          Paul Joseph Galvez is placed in the custody of the

2     U.S. Bureau of Prisons to serve a term of imprisonment of 168

3     months.

4          I am going to recommend that you be placed in the

5     men's facility at Butner, North Carolina; that you participate

6     in the sexual treatment program there and that you get mental

7     health counseling as well, education and job training.

8          Upon release from the Bureau of Prisons you're placed

9     on supervised release for life.

10          The general terms of supervised release are those set

11     for the U.S. Courts for the Western District of Texas.  The

12     special terms of supervised release are as follows:

13          You shall not be permitted to reside any place where

14     firearms are possessed or stored.  You shall abstain -- means

15     you cannot use -- alcohol or any other intoxicant during the

16     term of your supervised release.

17          You shall attend and participate in a mental health

18     treatment program and/or sex offender treatment program as

19     approved and directed by the probation officer.

20          You shall abide by all program rules, requirements,

21     and conditions of the sex offender treatment program, including

22     submission to polygraphic testing at your own expense to

23     determine if you're in compliance with such program.

24          You shall follow all other lifestyle restrictions or

25     treatment requirements imposed by the therapist and continue

 1  those restrictions as they pertain to avoiding risk situations

 2  throughout the course of supervision.  This includes not

 3  residing or going to places where a minor or minors are known

 4  to frequent without prior approval of the probation officer.

 5          You shall not possess or use a computer with access

 6  to any online computer service at any location, including your

 7  employment, without the prior written approval of the Probation

 8  Department.  This includes any Internet service provider,

 9  bulletin board system, or other public or private computer.

10          You shall not have any contact with children under

11  the age of 18 unless the contact is approved and authorized in

12  advance by a United States probation officer and supervised by

13  a person approved by a United States probation officer.

14          You shall refrain from purchasing, possessing, or

15  using any sexually stimulated or sexually oriented materials,

16  including, but not limited to, pornographic books, magazines,

17  photographs, films, videos, DVDs, computer programs, or any

18  other media for the portrayal of the same.

19          You shall reside in a residence approved in advance

20  by the probation officer.  Any changes in the residence must be

21  approved by the probation officer.

22          Such sentence shall run consecutive to the sentence

23  given to you by the Texas Department of -- or by the State

24  Court and for which you are serving in Cause Number 4972 in the

25  109th Judicial District Court of Andrews County, Andrews,

1  Texas.

2       So that -- this sentence will run consecutive to that

3  sentence for theft and arson and insurance fraud for which I

4  think you were given a five-year confinement.

5       Mr. Galvez, I find that you do not have the ability

6  to pay a fine.

7       You are required to pay the mandatory special

8  assessment to the Crime Victims Fund of $100.00.

9       You have the right to appeal this sentence and

10  conviction assuming your rights to appeal were not given up or

11  waived as part of your plea agreement in this case.

12       And let me say, I do not find the Government moving

13  for an upward departure being in violation of the plea

14  agreement simply because it was silent on that issue.

15       If you cannot afford an attorney to represent you on

16  appeal, an attorney will be appointed for you.

17       With few exceptions, any notice of appeal must be

18  filed within ten days from today in writing.  And if you cannot

19  afford it, a transcript of the record in this case will be

20  prepared for appeal at the Government's expense.

21       Ms. Fleck, does the Government want to dismiss Counts

22  Two and Three pursuant to the plea agreement?

23       MS. FLECK:  Yes, Your Honor.

24       THE COURT:  Counts Two and Three of the plea

25  agreement are dismissed with prejudice on motion of the

1    Government.

2              Anything else from the Government, Ms. Fleck?

3              MS. FLECK:  No, Your Honor.

4              THE COURT:  Anything else, Mr. Greenhaw?

5              MR. GREENHAW:  No, Your Honor.

6              THE COURT:  Good luck to you, Mr. Galvez.  At this

7    time you're remanded back to the custody of the United States

8    Marshals.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     I, TODD ANDERSON, United States Court Reporter for the

2  United States District Court in and for the Western District of

3  Texas, Midland/Odessa Division, hereby certify that the above

4  and foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6     WITNESS MY HAND on this 11th day of September, 2009.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            200 E. Wall, Rm. 107
                              Midland, Texas  79701
12                            (432) 686-0605

13

14

15

16

17

18

19

20

21

22

23

24

25